UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

FEB 6 2014

LONG ISLAND OFFICE

**FILED UNDER SEAL**

---------------------------------------------------X
RxUSA WHOLESALE, INC.,

                          Plaintiff,                     **MEMORANDUM AND ORDER**
                                                          06 CV 4343 (DRH) (AKT)

          - against -

McKESSON CORP.,

                          Defendant.
---------------------------------------------------X

**APPEARANCES:**

**LEVINE & ASSOCIATES, P.C.**
Attorneys for Plaintiff
15 Barclay Road
Scarsdale, NY 10583
By:    Michael Levine, Esq.

**LATHAM & WATKINS LLP**
Attorneys for Defendant
885 Third Avenue
New York, NY 10022
By:    Terrence J. Connolly, Esq.
       Meaghan B. Chmura, Esq.

**HURLEY, Senior District Judge:**

          RxUSA Wholesale, Inc. ("plaintiff" or "RxUSA") commenced this action against

McKesson Corporation ("defendant" or "McKesson") for damages allegedly stemming from

breaches of a supply agreement ("Supply Agreement"). Presently before the Court is

defendant's motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56,

seeking dismissal of plaintiff's claims in their entirety. For the reasons that follow, defendant's

motion is granted.

                                  *BACKGROUND*

          The following material facts, drawn from the parties' Local Civil Rule 56.1 Statements

and evidentiary submissions, are undisputed unless otherwise noted.

***The Supply Agreement***

At all times relevant to this action, RxUSA and McKesson were engaged in the business of selling pharmaceutical products. On October 1, 2003, McKesson entered into a Supply Agreement with RxUSA[1] and four of its affiliates[2] (collectively, "the Customers") in order to "establish a multi-year program for the supply of prescription drugs and other health and beauty care products by McKesson to mail order, long term care and wholesale facilities owned or operated by the Customers (referred to herein individually as a 'Facility' and collectively as the 'Facilities')." (Chmura Decl., Ex. B ("Supply Agreement") at 1.) The Supply Agreement commenced on September 1, 2003, and had a three-year term. (Supply Agreement ¶ 2.) During this period, "each Customer agree[d] to designate McKesson as a primary supplier of Merchandise and to purchase from McKesson substantially all of the requirements of its Facilities for Merchandise and other items covered hereunder."[3] (*Id.*)

---

[1] Although RxUSA Wholesale, Inc. is not named in the Supply Agreement, it is undisputed that RxUSA International, Inc. is the former name of RxUSA Wholesale, Inc.

[2] The four affiliates were: (1) RxUSA, Inc.; (2) Parsons Medical Center Pharmacy, Inc.; (3) RxUSA PBM; and (4) PBM America, Inc. They are not parties to this action.

[3] "Merchandise" was defined as "all items normally stocked or drop-shipped by McKesson Drug Distribution Centers servicing the 48 contiguous states, including prescription drugs, OTC drugs, health and beauty aids and sundries." (Supply Agreement ¶ 1.)

Paragraph 5 of the Supply Agreement titled "COST OF GOODS" not only established the cost of goods for products purchased by the Customers but also contained various purchase commitments. For example, Paragraph 5.A of the Supply Agreement provided the following:

> Customers expressly commit to purchase a total of $480,000,000 (net of returns, allowances and rebates) in Direct Facility Delivery ('D.F.D.') volume of Merchandise from McKesson during the term of this Agreement ('Volume Purchase Commitment'). If at any time after the first year of this Agreement Customers have not achieved the appropriate pro rata purchase volume based on its Volume Purchase Commitment, McKesson, in addition to the other rights and remedies available to it hereunder, reserves the right in its sole discretion to re-determine the Cost of Goods pricing specified below.

(Supply Agreement ¶ 5.A.)     Paragraph 5.C provided the Cost of Goods pricing as follows:

> Customers hereby agree to maintain a minimum monthly average volume of $6,666,667 in D.F.D. prescription drug and OTC product purchases (net of returns, allowances and rebates) per Facility from McKesson throughout the term of this Agreement ('Monthly Volume Commitment'). Unless otherwise indicated, each Customer shall at the time of implementation of service under this Agreement be charged the applicable markup specified below consistent with such Monthly Volume Commitment, as determined by multiplying the number of Customers' Facilities by the above-specified Monthly Volume Commitment. Each Customer's Cost of Goods thereafter shall be subject to quarterly review by McKesson and will be adjusted, if and to the extent necessary, to reflect the Customers' then current Facility-wide quarterly average purchase volume.

| Facility-wide Quarterly Average Volume (net of returns, allowances and rebates | Cost Plus Markup (Based on Weekly Payment Terms as Defined in Section 4.A) Rx/OTC |
|---|---|
| $40,000,000 - $41,999,999 | -3.00% |
| $42,000,000 - $43,999,999 | -3.02% |
| $44,000,000 - $45,999,999 | -3.04% |
| $46,000,000 - $47,999,999 | -3.06% |
| $48,000,000 - $49,999,999 | -3.08% |
| $50,000,000 and above | -3.10% |

(Supply Agreement ¶ 5.C.)    Finally, Paragraph 5.F contained the following:

> It is further understood and agreed by the parties that if the Customers fail to maintain a minimum average volume of $6,650,000 in D.F.D. prescription drugs and OTC product purchases (net of returns, allowances and rebates) per Facility per month from McKesson during any consecutive three (3) months of this Agreement (excluding the first three (3) month period of this Agreement), such failure shall constitute a default under this Agreement by the Customers.

(Supply Agreement ¶ 5.F.)

In addition, Paragraph 3(B) of the Supply Agreement provided the following obligation

on the part of McKesson:

> In the event that the primary distribution center servicing any Customer is temporarily out of stock of any prescription items, such distribution center will utilize McKesson's National Distribution Network to make those items available for Facility order.    If the item is not available within the McKesson network, it will be drop-shipped from the vendor if stock is available.

(Supply Agreement ¶ 3.B.)

The Supply Agreement also contained various termination provisions.    Paragraph 14

stated that should a Customer default, "McKesson may terminate as to such defaulting Customer

or as to all Customers, at McKesson's sole discretion, on five (5) days' written notice."

(Supply Agreement ¶ 14.B.)    The Supply Agreement also granted McKesson the right to

terminate "without cause upon ninety (90) days written notice."    (Supply Agreement ¶ 14.A.)

In the event of a termination, Paragraph 14.F of the Supply Agreement provided that the

following liabilities and rights survived termination and remained in full force and effect: "1)

Liability for accounts receivable balances or any other payment due hereunder to the other party

at the date of or upon the occurrence of such termination; 2) Obligations imposed on each party

under the Proprietary and Confidentiality information section set forth below; and 3) Such rights

4

as either party may enjoy in law or in equity." (Supply Agreement ¶ 14.F.) However, according to paragraph 19Q, "[i]n no event shall McKesson be liable to any Customer or any other entity for any special, consequential, incidental or indirect damages, however caused, on any theory of liability and whether or not McKesson has been advised of the possibility of such damages." (Supply Agreement ¶ 19.Q.)

### Amendment to the Supply Agreement

The Supply Agreement was amended by the First Amendment to the Supply Agreement ("First Amendment"), which took effect on September 28, 2005. (Chmura Decl., Ex. D ("First Amendment") at 1.) For purposes of the present motion, the First Amendment made three material changes to the Supply Agreement. First, it deleted Paragraph 5.A of the Supply Agreement, which set a Volume Purchase Commitment of $480,000,000, and provided for an Annual Volume Purchase Commitment of $24,000,000 for each year of the three-year term.[4] (First Amendment ¶ 6.) Second, Paragraph 5.C of the Supply Agreement, which set a Monthly Volume Commitment of $6,666,667, was amended by deleting $6,666,667 and replacing it with

---

[4] The exact language of Paragraph 6 to the First Amendment is as follows:

> In consideration for the Cost of Goods specified herein, Customers expressly commit to purchase a total of $24,000,000 (net of returns, allowances and rebates) in Direct Facility Delivery ('D.F.D.') volume of Merchandise from McKesson during each year of the three-year term of this Agreement ('Annual Volume Purchase Commitment'). If at any time after the first year of this Agreement Customers have not achieved the appropriate pro rata purchase volume based on its Annual Volume Purchase Commitment, McKesson, in addition to the other rights and remedies available to it hereunder, reserves the right in its sole discretion to re-determine the Cost of Goods pricing below.

$2,000,000.[5]   (First Amendment ¶ 7.)   Third, Paragraph 5.F. of the Supply Agreement, which provided that any Customer that failed to maintain a minimum average volume of $6,650,000 in D.F.D. prescription drug and OTC product purchases per facility per month for three consecutive months would be in default, was amended by deleting $6,650,000 and replacing it with $2,000,000.   (First Amendment ¶ 11.)   The First Amendment did not extend the original three-year term of the Supply Agreement.

### Parties' Conduct under the Supply Agreement

Plaintiff alleges that "[f]rom or about October of 2003 through or about the first quarter of 2006, Plaintiff placed orders to McKesson for an aggregate of $1,483,587,185.78 of pharmaceutical products," and that McKesson did not satisfy those orders.   (Amend. Compl. ¶¶ 13-15.)   It is undisputed, however, that McKesson sold RxUSA at least $432 million of product under the Supply Agreement.   In addition, during the period 2003 to 2006, RxUSA purchased pharmaceutical products from vendors other than McKesson, including approximately $100 million of product from another vendor, Independent Pharmacy Cooperative.

On February 23, 2006, McKesson terminated the Supply Agreement pursuant to the termination without cause provision, which took effect on May 23, 2006.   As a result, the unamended Supply Agreement was in effect for twenty-five months (September 1, 2003 through

---

[5]   The Cost of Goods pricing matrix contained in Paragraph 5.C of the Supply Agreement was also deleted and replaced by the following:

| Facility-wide Monthly Average Volume (net of returns, allowances and rebates) | Cost Plus Markup (Based on Weekly Payment Terms as Defined in Section 4.A) Rx/OTC |
|---|---|
| $2,000,000 and above | -2.00% |

(First Amendment ¶ 8.)

6

September 28, 2005), and the amended Supply Agreement was in effect for close to eight months prior to its termination (September 28, 2005 through May 23, 2006).

Plaintiff's Amended Complaint asserts three causes of action. First, RxUSA claims that it incurred direct and proximate damages of $54,160,257.88 when McKesson breached Paragraph 3.B of the Supply Agreement by failing to deliver over one billion dollars of ordered pharmaceutical products as it refused to utilize McKesson's national distribution network and refused to arrange for drop-shipments or dock-to-dock shipments from the manufacturers of the goods to fulfill plaintiff's orders. Additionally, "[i]n the event of a determination that Plaintiff is contractually barred from collecting its actual damages, or that the calculation of money damages is too uncertain," RxUSA seeks specific performance. (Amend. Compl. ¶ 32.) Second, RxUSA alleges that in the event of a determination that the damages regarding McKesson's purported breach of Paragraph 3.B are not direct and proximate, but rather special, consequential, incidental or indirect, plaintiff is entitled to recover because Paragraph 19.Q, which precludes McKesson from being held liable for any "special, consequential, incidental or indirect damages," is unconscionable and void as against public policy. RxUSA has withdrawn its third cause of action, which sought damages based on McKesson's alleged breach of Paragraph 7 of the Supply Agreement requiring McKesson to accept for return any and all goods which became "unsaleable" as that term was defined by the Supply Agreement.

### *The Motion to Dismiss*

McKesson previously moved to dismiss RxUSA's breach of contract claim, arguing that "it had no obligation to fill unlimited orders submitted by Plaintiff and that it ha[d] already satisfied any supply obligations it had to Plaintiff under the Supply Agreement." (Chmura Decl., Ex. A ("Mem. & Order") at 8.) Specifically, McKesson maintained that the Supply

7

Agreement was unenforceable beyond the quantity of goods identified in the contract, the $480,000,000 Volume Purchase Commitment provided in Paragraph 5.A. Thus, it was defendant's contention that the Supply Agreement could not be read to establish anything more than a $480 million total quantity requirement over the three-year term, and that it had no obligation to supply any more than that. In response, plaintiff maintained that Paragraphs 5.C and 5.F of the Supply Agreement required minimum monthly average volumes of $6,666,667.00 and $6,650,000.00 in purchases per Facility and that the agreement contemplated five facilities. Accordingly, RxUSA claimed that its minimum purchase requirement was over one billion dollars based on the five purported facilities owned or operated by the Customers.[6]

In denying defendant's motion to dismiss, the Court held, *inter alia*, that the Amended Complaint adequately stated a claim for breach of contract. In so holding, the Court concluded that: (1) the Supply Agreement was a contract for the sale of goods governed by New York's version of the Uniform Commercial Code; (2) a contract had to specify a quantity term in order to satisfy the Statute of Frauds, codified at N.Y. U.C.C. § 2-201; (3) a minimum quantity term was sufficient to satisfy the Statute of Frauds; and (4) the Supply Agreement set forth a minimum quantity that plaintiff was obligated to purchase and, thus, satisfied N.Y. U.C.C. § 2-201. (*Id.* at 9-14.) It was noted, however, that "to the extent Defendant asks this Court to find, as a matter of law, that Plaintiff's recovery is limited to what Defendant interprets to be Plaintiff's minimum purchase requirement under the Agreement, the Court declines to do so as such issues are beyond the parameters of a Rule 12(b)(6) motion." (*Id.* at 14-15.)

---

[6] For example $6,650,000 (monthly minimum per facility) x 5 (facilities) x 36 (months) = $1,197,000,000.

8

### The Present Motion

Defendant now moves the Court to find as a matter of law that defendant was not

obligated to supply goods to plaintiff in excess of the $480,000,000 minimum purchase

requirement set out in Paragraph 5.A.[7]    Plaintiff RxUSA contends:

> "There is no question . . . that the minimum purchase requirement that RxUSA became obligated to comply with . . . was at least $6,650,000 per month (over the thirty-six month life of the Supply Agreement) *multiplied by* the number of Facilities that were owned or operated by RxUSA.  If, as RxUSA contends, the number of Facilities that the RxUSA entities owned or operated was five then the minimum purchase obligation over the life of the Supply Agreement was One Billion, One Hundred Ninety-Seven Million Dollars ($1,197,000,000.00) [$6,650,000 x 5 x 36].

(Pl.'s Mem. in Opp'n at 6.)

Defendant argues, however, that it did not breach the Supply Agreement because the number of

Facilities subject to the agreement was only two, not five, making the Supply Agreement a $480

million contract.[8]    (Def.'s Mem. in Supp. at 5.)    Plaintiff frames the issue before the Court as

such: "[t]he question that must be determined by the Court on this summary judgment motion,

therefore, is whether any genuine issue of fact exists regarding the number of Facilities owned

and operated by RxUSA that were included within the scope of the Supply Agreement."    (Pl.'s

Mem. in Opp'n at 7.)

---

[7]  Neither party seems to dispute that defendant was obligated to supply goods only in the amount of the minimum purchase requirement, although the parties dispute the amount of that minimum purchase requirement.

[8]  McKesson argues that even though it only supplied $432 million of product, it fulfilled its obligations because the effect of the First Amendment to the Supply Agreement and its early termination was to reduce the volume obligation of the agreement to $349,333,333.    (Def.'s Mem. in Supp. at 16-17.)

## *DISCUSSION*

### I. <u>*Summary Judgment Standard*</u>

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, on conclusory statements, or on "mere assertions that

affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The district court, in considering a summary judgment motion, must also be mindful of the underlying burdens of proof because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to present sufficient evidence in support of his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.    *Defendant's Motion for Summary Judgment*

To establish a breach of contract claim in New York, a plaintiff must show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."[9]  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994).

### A.    Breach of Paragraph 3.B

---

[9]    The Supply Agreement explicitly provides that it "shall be construed in accordance with the laws of the state of New York." (Supply Agreement ¶ 19.E.)

11

### *1. Contract Interpretation*

In order to determine if a question of fact exists as to whether McKesson breached the agreement, the Court must first analyze the obligations set forth in the Supply Agreement. "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000); *see also Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."). Ambiguity "is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "No ambiguity exists when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)); *see also Red Rock Commodities, Ltd. v. Standard Charted Bank*, 140 F.3d 420, 424 (2d. Cir 1998) ("A contract is not ambiguous where there is no reasonable basis for a difference of opinion."). "In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.' " *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)). "[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or

meaningless . . . is not preferred and will be avoided if possible.' " *Shaw Grp.*, 322 F.3d at 124

(quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)); *see also Cruden v. Bank of N.Y.*, 957

F.2d 961, 976 (2d Cir. 1992) ("[T]he entire contract must be considered, and all parts of it

reconciled, if possible, in order to avoid an inconsistency.")

Even where a contract can be reasonably interpreted in more than one way, "ambiguity

itself is not enough to preclude summary judgment." *Mellon Bank, N.A. v. United Bank Corp.*

*of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994). "If the court finds that the terms, or the inferences

readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic

evidence to ascertain the meaning intended by the parties during the formation of the contract."

*Alexander & Alexander Servs., Inc. v. Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir.

1998). However, "[t]o the extent the moving party's case hinges on ambiguous contract

language, summary judgment may be granted only if the ambiguities may be resolved through

extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic

evidence that would support a resolution of these ambiguities in favor of the nonmoving party's

case." *Topps Co.*, 526 F.3d at 68; *accord Compagnie Financiere*, 232 F.3d at 158.

### 2.  *The Supply Agreement*

The Court begins its analysis with the question of whether the Supply Agreement is

ambiguous as a matter of law, in particular in terms of the clauses relating to the purchase

requirements at issue here.  The Supply Agreement contains three separate clauses that set forth

purchase requirements.  First, Paragraph 5.A states that the "Customers expressly commit to

purchase a total of $480,000,000 . . . in Direct Facility Delivery ('D.F.D.') volume of

Merchandise from McKesson during the term of this Agreement ('Volume Purchase

Commitment')."  Second, Paragraph 5.C indicates that the "Customers hereby agree to maintain

a minimum monthly average volume of $6,666,667 in D.F.D. prescription drug and OTC product purchases . . . per Facility from McKesson throughout the term of this Agreement. ('Monthly Volume Commitment')."   Finally, Paragraph 5.F references that "if the Customers fail to maintain a minimum average volume of $6,650,000 in D.F.D. prescription drugs and OTC product purchases . . . per Facility per month from McKesson during any consecutive three (3) months of this Agreement, . . . such failure shall constitute a default under this Agreement by the Customers."

The parties' disagreement as to the number of Facilities contemplated by the agreement has led to competing interpretations as to the exact purchase commitment required by the contract.   According to McKesson, "the $480 million Volume Purchase Commitment in Paragraph 5.A is identical to two Facilities, times the minimum monthly average volume of $6,666,667 per Facility set out in Paragraph 5.C of the contract, times the thirty-six month term of the contract."   (Def.'s Mem. in Supp. at 14.)   Accordingly, McKesson argues that "[w]hen read with the parties' understanding that the contract contemplated two Facilities, the Supply Agreement is consistent throughout, all provisions are given force and effect, and there are no redundancies."   (*Id.*)   Moreover, McKesson argues that "the definition in Paragraph 5.A of the 'Volume Purchase Commitment' as $480 million would be contradicted if Paragraph 5.C or 5.F were read to require purchase obligations in excess of $1 billion."   (*Id.*)

In response, RxUSA argues that 5.A, 5.C, and 5.F all can be read in harmony without a finding that the agreement contemplated two facilities because "the Supply Agreement had two *different* minimum purchase requirements, each for a specific (and not inconsistent) purpose." (Pl.'s Mem. in Opp'n at 17.)   Moreover, RxUSA contends that the $480 million Volume Purchase Commitment did not set forth a maximum purchase, but a minimum purchase

14

requirement, and that "[i]f RxUSA failed to reach that minimum, McKesson had the right to re-determine the sale price of the goods (ostensibly retroactively)." (*Id.*). Furthermore, RxUSA urges that the $6,650,000 per month per facility minimum requirement was a "much more Draconian minimum purchase requirement," that if not met by RxUSA for any three consecutive months, allowed McKesson to terminate the Supply Agreement with only five days notice. (*Id.* at 18.)

The Court is not convinced that in order for 5.A, 5.C, and 5.F to exist in harmony, the agreement must have contemplated two facilities. Ambiguity certainly arises, however, when considering what qualifies as a Facility for purposes of paragraphs 5.C and 5.F. The preamble to the Supply Agreement states that the scope of the agreement covers "mail order, long term care and wholesale facilities owned or operated by the Customers." The types of establishments that qualify as mail order, long term care or wholesale facilities, however, is susceptible to varying interpretations. According to McKesson, "[t]hree of the Facilities identified by RxUSA [in its Interrogatory Responses as] 'Retail Pharmacies,' . . . fall squarely outside the Supply Agreement's definition of Facility." (Def.'s Mem. in Supp. at 11.) Plaintiff argues in response that it was merely listing the licensing classification of each Facility and not the *nature of the business*" of each Facility, and that the "preamble [to the Supply Agreement] does *not* apply to 'licensing' classifications, it deals with the *nature* of the business of the Facilities." (Pl.'s Mem. in Opp'n at 14.) Further, RxUSA contends that "[t]he nature of the businesses of [] *all* of the three disputed entities fall [sic] within the scope of the Supply Agreement" because all of them "service long term care patients, and *all* of them offer mail order services." (*Id.*) In reply, Defendant McKesson argues that the three disputed Retail Pharmacies were not covered by the Supply Agreement because although they may have

15

serviced long-term care patients and the facilities that housed them, they themselves were not long-term care facilities "owned and operated" by RxUSA, as the Supply Agreement requires. (Def.'s Reply at 9.) Overall, the Court finds that the agreement is not clear on its face as to whether "Facility" covers only those establishments that are licensed as mail order, long term care, or wholesale establishments or if it includes those that engage in mail order, long term care, or wholesale business.

Furthermore, extrinsic evidence does not resolve the ambiguity. Both parties have offered evidence supporting their position as to the number of facilities contemplated by the agreement. For example, RxUSA provides two emails from Brian Ferreira, McKesson's Vice President of Sales in which he categorizes the three disputed entities as long term care and/or mail order facilities that would have been within the terms of the contract. (*See* Pl.'s Exs. 6, 7.) In addition, McKesson offers several emails from Robert Drucker, the president of RxUSA, in which Mr. Drucker refers to the value of the contract as $480 million dollars, not over one billion dollars, the result if the agreement contemplated five facilities. (*See* Def.'s Exs. O, P, and Q.) As a result, a genuine question of fact exists as to which entities qualify as "Facilities" under the contract and it is not possible to determine as a matter of law the minimum purchase requirement set forth by Paragraph 5.C.

### B. Damages

McKesson contends that RxUSA's breach of contract claims should be dismissed on the independent ground that "RxUSA cannot meet its burden of establishing its right to any remedy." (Def.'s Mem. in Supp. at 19.) As McKesson notes, Paragraph 19.Q prohibits RxUSA's recovery of consequential damages, which it asserts includes lost profits resulting from RxUSA's inability to resell the goods that were not delivered to it. At this stage, RxUSA does

not argue that the damages it seeks are direct rather than consequential,[10] but it asserts "that the limitation of liability provision is clearly unconscionable." (Pl.'s Mem. in Opp'n at 24.) Although unconscionability is a question of law for the Court, *see King v. Fox*, 418 F.3d 121, 130 n. 5 (2d Cir. 2005), the Court declined to dismiss the unconscionability claim at the motion to dismiss phase finding that "the Court [could] not state as a matter of law that there [was] no possibility that paragraph 19(Q) of the Supply Agreement was unconscionable." (Mem. and Order at 20.) The Court noted that it would be best to resolve the issue of unconscionability at the summary judgment stage after each party had been "afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." N.Y. U.C.C. § 2-302.

In *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1 (1988), the Court of Appeals outlined the doctrine of unconscionability as follows:

> An unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms. The doctrine, which is rooted in equitable principles, is a flexible one and the concept of unconscionability is intended to be sensitive to the realities and nuances of the bargaining process. A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made – i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.

---

[10] At the motion to dismiss stage plaintiff argued that "[w]hile lost profits may fall within the ambit of 'consequential' damages in traditional cases, RxUSA believes that such damages are direct and proximate when the agreement at issue contemplates a sale of goods specifically *for resale, and the goods are ordered specifically for that purpose, and the parties transaction is governed by New York's Statute of Frauds*," however, plaintiff now accepts the Court's rejection of that argument as the law of the case. (Pl.'s Mem. in Opp'n at 23.)

> The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power.
>
> . . . .
>
> [The substantive element of unconscionability] entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged.

*Id.* at 10-11 (internal citations and quotation marks omitted); *see also Universal Leasing Servs., Inc. v. Flushing Hae Kwan Restaurant*, 565 N.Y.S.2d 199, 200 (2d Dep't 1991) (noting that "procedural unconscionability concerns the contract formation process, while substantive unconscionability looks to the content of the contract"). "[I]n general, it can be said that procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (2d Dep't 1983).

Here, RxUSA argues that the agreement was procedurally unconscionable because Mr. Drucker, who signed the Supply Agreement, "did not understand that a limitation on the ability to recover 'consequential damages' (especially as the term is defined in the UCC) meant that the profit he was going to receive from the resale of goods would be lost [if] McKesson breached its delivery obligations." (Pl.'s Mem. in Opp'n at 24.) "As Mr. Drucker explains, he has seen many distribution agreements in the pharmaceutical industry, and had never, ever seen one that, at least on its face, appeared to be so iron clad." (*Id.*) McKesson argues that the terms of the

contract are not unconscionable because RxUSA and McKesson are both sophisticated commercial entities.

The Court finds that RxUSA has not sufficiently set forth evidence of procedural unconscionability. The fact that Mr. Drucker may not have understood the full effect of the contract is not sufficient to establish unconscionability. *See Myskina v. Conde Nast Publ'ns, Inc.*, 386 F. Supp 2d 409, 414 (S.D.N.Y. 2005) ("Absent allegations of fraud, duress, or some other wrongdoing, [plaintiff's] claimed misunderstanding of the [contract's] terms does not excuse her from being bound on the contract."). In addition, "there is a presumption of conscionability when [as is here] the contract is between businessmen in a commercial setting." *See American Dredging Co. v. Plaza Petroleum, Inc.*, 799 F. Supp. 1335, 1339 (E.D.N.Y. 1992), *vacated in part on other grounds*, 845 F. Supp. 91 (1993). Furthermore, the Court rejects RxUSA's argument that the terms of the contract were substantively unconscionable as a "[l]imitation of consequential damages where a loss is commercial is ordinarily not considered unconscionable under New York law, in accordance with the underlying policy of the U.C.C. that parties to an agreement are 'left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.' " *Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F. Supp. 1012, 1018 (E.D.N.Y.1996) (quoting *AT & T v. New York City Human Resources Admin.*, 833 F.Supp. 962, 988 (S.D.N.Y.1993)), *aff'd*, 125 F.3d 845 (2d Cir.1997).

The Court also rejects RxUSA's argument "that compelling McKesson to specifically perform the Supply Agreement is appropriate." (Amend. Compl. ¶ 49.) "[T]he decision whether or not to award specific performance is one that rests in the sound discretion of the trial court." *Aristocrat Liesure Ltd. v. Deutsche Bank Trust Co. Americas*, 2006 WL 1493132, at *7

(S.D.N.Y. May 31, 2006) (internal quotation marks and citations omitted). Section 2-716 of New York's U.C.C. directs that "specific performance may be decreed where the goods [at issue] are unique or in other proper circumstances." "In general, specific performance will not be ordered where money damages would be adequate to protect the expectation interest of the injured party." *Id.* at *8 (internal quotation and citation omitted); *see also Lucent v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) ("[B]efore the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice.").

Here, RxUSA argues that "specific performance is appropriate because the goods at issue could not, *de facto*, be elsewhere obtained and damages (if lost profits are unavailable) are, therefore, insufficient to procure suitable substitutes." (Pl.'s Mem. in Opp'n at 28-29.) RxUSA's argument, however, fails to support a conclusion that specific performance is warranted. Its assertion that it was unable to obtain the merchandise covered by the agreement elsewhere "in sufficient quantities to fill customers' orders," (Pl.'s Mem. in Opp'n at 26), does not prove that the goods were so unique as to warrant specific performance, just that they were not available in large volume.[11] *See Aristocrat Liesure*, 2006 WL 1493132, at *8 ("Rather, specific performance is a proper remedy where the subject matter of the particular contract is unique and has no established market value." (internal quotation marks and citations omitted)). RxUSA offers no support that the merchandise at issue, defined in the contract as "all items normally stocked or drop-shipped by McKesson Drug Distribution Centers servicing the 48

---

[11] Although Official Comment 2 to N.Y. U.C.C. 2-716 suggest that "inability to cover is strong evidence of 'other proper circumstances' " warranting specific performance, RxUSA's claim fails because it has not proven that money damages would be inadequate.

contiguous states, including prescription drugs, OTC drugs, health and beauty aids and sundries," is unique rather than comprised of "mass-produced fungible products" as McKesson urges. (Def.'s Reply at 14.)   In fact, RxUSA's own assertions support a finding that the goods were not unique as it admits to purchasing at least $100,000,000 in pharmaceutical product from other vendors throughout the term of the contract.   (Def.'s R. 56.1 Stmt. ¶¶ 21-22.)   Moreover, RxUSA has not demonstrated that money damages would be inadequate to protect its expectation interest.   Indeed there would have been an adequate remedy had RxUSA not contracted away its right to consequential damages when it signed the Supply Agreement. RxUSA's choice to relinquish its rights does not entitle it to specific performance.   *See Allen Bros., Inc. v. Abacus Direct Corp.*, 2003 WL 21147985, at * 3 (N. D. Ill. May 14, 2003). ("[Plaintiff] may sincerely believe, with the benefit of 20/20 hindsight, that agreeing to a very restrictive limitation on damages was a bad idea.   But this belief is not enough to show that there is no adequate remedy at law. Instead, it simply shows that there is no relief available under the parties' contract.")   Therefore, the Court denies plaintiff's request for specific performance.

As discussed above, the Court finds as a matter of law that the provision of the contract prohibiting consequential damages is enforceable and that RxUSA is not entitled to specific performance.   Since RxUSA has not raised a genuine issue of fact, let alone any argument whatsoever, that it is entitled to damages on any other front, it cannot establish an essential element of its claim.   As a result, the Court dismisses its claim that McKesson breached Paragraph 3.B of the Supply Agreement.

### C.   *Breach of Paragraph 7*

Although plaintiff agrees to a dismissal of its second breach of contract claim, the Court must decide whether to dismiss this claim with or without prejudice.   Plaintiff's second breach

of contract claim is premised on McKesson's purported refusal to accept for return any and all goods which have become unsaleable in accordance with Paragraph 7. At the motion to dismiss stage, the Court held that "reasonable minds could disagree as to whether the return policy survives termination of the agreement." (Mem. and Order at 23.) Moreover, the Court found that "although returns are not specified as one of the rights surviving termination under Paragraph 14F, given the inherent delays in the return process, it may very well be that custom in this particular business dictates that such is the case." (*Id.* at 24.)

On its motion for summary judgment, McKesson argues that (1) there is no evidence to support any business custom allowing for post-termination returns; and (2) plaintiff admitted that it has not suffered any harm from its alleged refusal to accept post-termination returns. (Def.'s Mem. in Supp. at 17-19.) In response, plaintiff concedes that the claim is "premature" as "it has not yet incurred any damages as a result of McKesson's refusal to adhere to the returns provision of the Supply Agreement."[12] (Pl.'s Mem. in Opp'n at 23.) Thus, plaintiff "agrees to the dismissal of this Cause of Action and will take the appropriate action if and when it actually incurs any damages." (*Id.*) Interpreting this as a request by RxUSA to dismiss the breach of contract claim without prejudice, McKesson maintains that this claim should be dismissed with prejudice because "RxUSA has [] failed to introduce any evidence . . . that McKesson had any obligation to accept product returns after the contract had ended" and in order "to avoid waste of

---

[12] According to RxUSA, "[a]t the time that this action was commenced, demand was being made on RxUSA by its main customer for payment to the customer for returns it had made to RxUSA," and "RxUSA anticipated that it would incur damages as a result prior to the completion of discovery in [that]case." (Pl.'s Mem. in Opp'n at 22.) RxUSA now asserts, however, that "it will not incur any damages if it is successful in the pending litigation." (*Id.* at 23.)

22

judicial resources, duplicative litigation and the possibility of further vexatious litigation by RxUSA." (Def.'s Reply at 12.)

"[T]he trial court has considerable discretion in deciding whether to allow a withdrawal of a claim without prejudice. In general, the court may allow such a dismissal if the defendant will not be prejudiced thereby, and should consider the defendant's effort and expense in defending the action as well as the plaintiff's reasons for needing such a dismissal." *Wakefield v. Northern Telecom, Inc.* 769 F.2d 109, 114 (2d Cir. 1985) (internal citation omitted).

Here, the Court concludes that plaintiff's claim should be dismissed with prejudice. Whether or not plaintiff suffered damages as a result of the purported breach of Paragraph 7 was something known to RxUSA when it commenced this action, when it opposed defendant's motion to dismiss this claim, and throughout discovery. Seeking to dismiss this claim without prejudice more than four years after commencing suit and in response to defendant's motion for summary judgment evidences a lack of diligence on plaintiff's part. Moreover, re-litigation would certainly result in duplicative expense and efforts on the part of defendant. Finally, since proof of damages is a necessary element to a breach of contract claim, by conceding that it has not incurred any damages from McKesson's purported refusal to accept post-termination returns, RxUSA has failed to establish its breach of contract claim as a matter of law, and RxUSA should not be permitted to dodge an adverse ruling simply by seeking dismissal of its claim without prejudice. *See Manti Transp., Inc. v. Assocs. Commercial Corp.*, 2002 WL 369807, at *4 (E.D.N.Y. Mar. 8, 2002) ("[A] party should not be permitted to avoid an adverse decision on a dispositive motion by dismissing a claim without prejudice." (internal quotation marks and citation omitted)). In any event, plaintiff neglects to address defendant's other argument in support of summary judgment, namely that the record does not contain any evidence supporting

a business custom allowing for post-termination returns. Based on the above, the Court dismisses plaintiff's second breach of contract claim with prejudice.

## *CONCLUSION*

For the reasons set forth above, the defendant's motion for summary judgment is granted and the Clerk of the Court is directed to close this case. As the parties' motion papers were filed under seal, access to this Memorandum and Order will be initially restricted to the parties only. The Court will lift this restriction and make the opinion available to the public within 21 days of the entry of this Order, unless the parties show good cause in writing before that date why the Court should not do so. Any showing must overcome the presumption that court documents are generally open to the public.

**SO ORDERED.**

Dated: Central Islip, New York
       February 6, 2013

/s/

Denis R. Hurley
Unites States District Judge